**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

_____

| | |
|---|---|
| **UNITED STATES SECURITIES** : | |
| **AND EXCHANGE COMMMISSION,** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **v.** : | |
| : | |
| **WILLIAM M. APOSTELOS, WMA** : | **CASE NO. 1:15-cv-00699** |
| **ENTERPRISES, LLC, MIDWEST GREEN** : | |
| **RESOURCES, LLC, and OVO WEALTH** : | **JURY TRIAL DEMANDED** |
| **MANAGEMENT, LLC,** : | |
| : | |
| **Defendants, and** : | |
| : | |
| **CONNIE APOSTELOS, APOSTELOS** : | |
| **ENTERPRISES, INC., COLEMAN** : | |
| **CAPITAL, INC., and SILVER BRIDLE** : | |
| **RACING, LLC,** : | |
| : | |
| **Relief Defendants.** : | |
| : | |

_____ :

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC" or the "Commission") alleges as follows:

1.      Between at least January 2010 through October 2014, William M. Apostelos ("Apostelos") and his companies WMA Enterprises, LLC ("WMA"); Midwest Green Resources, LLC ("Midwest Green"); and OVO Wealth Management, LLC ("OVO") perpetrated a fraudulent scheme against investors.

2.      During that time period, Apostelos, WMA, Midwest Green, and OVO raised at least $66.7 million from at least 350 investors.  Apostelos portrayed himself as a sophisticated

investor and businessman, and he exploited his network of clients, business associates, and friends to attract new investors.

3.     Throughout the scheme, Apostelos knowingly made multiple misrepresentations to recruit prospective investors.  For example, Apostelos told a number of investors that their investment funds would be pooled with funds from other investors and invested in real estate or used to make short-term loans at high interest rates to small businesses and farmers, with returns being generated by the underlying investments.  Apostelos also told certain investors that their funds would be pooled with other investor funds and invested in stocks or precious metals. Finally, Apostelos told certain investors that he would place their funds in a pooled brokerage account and invest them in publicly traded stocks, bonds, and options.  All of these representations were false.

4.     In reality, Apostelos funneled nearly all the investor funds to WMA's bank accounts and used them to make Ponzi-like payments to earlier investors and promoters; to finance other businesses he and his wife, Connie Apostelos, owned; and to pay for personal expenditures, including gambling.

5.     As a result of their conduct, Apostelos, WMA, Midwest Green, and OVO committed securities fraud.  Apostelos, WMA, Midwest Green, and OVO, directly and indirectly, also violated the securities laws by offering and selling unregistered securities as part of the scheme.

6.     WMA and Midwest Green violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7.     OVO violated Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), and 77q(a)(3)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)].

8.     Apostelos violated Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)]; Sections 10(b) and 15(a)(1) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)(1)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].  Additionally, Apostelos aided and abetted WMA's and Midwest Green's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  Apostelos is also liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for WMA's and Midwest Green's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9.     Connie Apostelos; Apostelos Enterprises, Inc. ("Apostelos Enterprises"); Coleman Capital, Inc. ("Coleman Capital"); and Silver Bridle Racing, LLC ("Silver Bridle") benefited from the fraudulent scheme by receiving at least $7 million in ill-gotten gains to which they have or had no legitimate claim.

10.     The SEC brings this lawsuit to prevent further harm to investors and to seek disgorgement and civil penalties stemming from Defendant's wrongdoing, among other remedies.

## JURISDICTION AND VENUE

11.     The SEC brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)], Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)], and Section 209 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-9].

12.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

13.     Venue is proper in this Court pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  The offers, sales, transactions, acts, practices, and courses of business constituting the violations alleged herein have occurred within the jurisdiction of the United States District Court for the Southern District of Ohio and elsewhere.

14.     Defendants Apostelos, WMA, Midwest Green, and OVO and Relief Defendants Connie Apostelos, Apostelos Enterprises, Coleman Capital, and Silver Bridle each resided and transacted business within the Southern District of Ohio.

15.     Defendants Apostelos, WMA, Midwest Green, and OVO directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein.

## DEFENDANTS

16.     **William M. Apostelos**, age 54, is a resident of Springboro, Ohio.  He is a manager of WMA, Chief Executive Manager of Midwest Green, Treasurer and 40% owner of OVO, and Secretary of Apostelos Enterprises.

17.     **WMA Enterprises, LLC** is an Ohio limited liability company with its principal place of business in Springboro, Ohio. WMA purports to be in the business of investment and real estate asset management.

18.     **Midwest Green Resources, LLC** is an Ohio limited liability company with its principal place of business in Springboro, Ohio. Midwest Green purports to be in the business of investment and real estate asset management. Midwest Green filed a Form D Notice of Exempt Offering of Securities on March 30, 2010, that described an offering of $10 million in equity securities and was signed by Apostelos.

19.     **OVO Wealth Management, LLC** is a Delaware limited liability company with its principal place of business in Springboro, Ohio. OVO was registered as an investment adviser in the states of Ohio, Indiana, and Kentucky until December 31, 2014.

## RELIEF DEFENDANTS

20.     **Connie Apostelos**, age 50, is a resident of Springboro, Ohio, and is married to William Apostelos. She is the President of Coleman Capital and Apostelos Enterprises, and the owner of Silver Bridle.

21.     **Apostelos Enterprises, Inc.,** formerly known as Carmen-Coleman, Inc. and Carmen-Crane, Inc., is an Ohio corporation with its principal place of business in Springboro, Ohio. Apostelos Enterprises purports to be in the business of residential construction and remodeling.

22.     **Coleman Capital, Inc.** is an Ohio corporation with its principal place of business in Springboro, Ohio. Coleman Capital purports to be in the business of business and administrative consulting activities and services.

23. **Silver Bridle Racing, LLC**, is an Ohio limited liability company with its principal place of business in Springboro, Ohio. Silver Bridle purports to be in the business of thoroughbred horse racing.

## FACTS

**Background**

24. In September 2009, Apostelos, along with two other individuals, formed Midwest Green. Apostelos formed WMA the following month, in October 2009. Beginning no later than January 2010 and continuing through October 2014, Apostelos began to solicit investors through both WMA and Midwest Green and in his individual capacity. Apostelos offered and sold investors promissory notes issued in his own name or in the name of WMA. Apostelos also offered and sold membership units in Midwest Green.

25. In approximately February 2013, Apostelos and other individuals formed OVO, a state-registered investment adviser. By 2014, Apostelos had begun recruiting OVO clients to invest in his scheme by advising them to transfer their OVO accounts to promissory note investments and Midwest Green membership units.

26. From its formation in October 2009 through at least October 2014, Apostelos controlled WMA. Apostelos was the sole member and manager of WMA. Apostelos opened bank accounts for WMA, and he approved all deposits and withdrawals from those accounts. Apostelos interacted with investors and prospective investors on behalf of WMA. Apostelos directed the management, policies, and day-to-day affairs of WMA.

27. From its formation in September 2009 through at least October 2014, Apostelos controlled Midwest Green. At the time Midwest Green was formed, Apostelos was the majority owner. As Chief Executive Manager of Midwest Green, Apostelos had primary responsibility

6

for managing the operations of the company, and he had the power and authority to control Midwest Green's written communications. Apostelos opened bank accounts for Midwest Green, which he signed as member and manager. Apostelos interacted with investors and prospective investors on behalf of Midwest Green. Apostelos directed the management, policies, and day-to-day affairs of Midwest Green.

28. From its formation in approximately February 2013 through at least October 2014, Apostelos controlled OVO. Apostelos interacted with clients and prospective clients on behalf of OVO. As OVO's Treasurer and 40% owner, Apostelos possessed the power to direct the management and policies of OVO.

**Apostelos's Unregistered Offering of Promissory Notes**

29. Between January 2010 and October 2014, Apostelos and WMA raised at least $56.9 million from approximately 330 investors, primarily by issuing promissory notes offering high, guaranteed rates of interest. These promissory notes were securities as that term is defined in Exchange Act Section 3(a)(10) [15 U.S.C. § 78c(a)(10)] and Securities Act Section 2(a)(1) [15 U.S.C. § 77b(a)(1)].

30. Apostelos actively solicited and personally met with prospective investors. In oral conversations, Apostelos told prospective investors varied lies about how their funds would be invested. Apostelos misrepresented to investors that he would invest their funds in stocks, precious metals, real estate, or loans to small businesses and farmers. Apostelos also told investors that their investment funds would be pooled with funds from other investors and placed in an investment personally selected and managed by Apostelos.

31. In exchange for their investment, Apostelos gave investors promissory notes issued either in his name or by WMA. Apostelos directed the preparation of all of the

promissory notes and also signed the notes. The promissory notes were uninsured and uncollateralized and promised exorbitantly high guaranteed interest rates, often ranging from 10 to 35%.

32.     The promissory notes generally had terms ranging from two or three months to a year. At the end of the term, Apostelos gave investors the option of taking their money out or reinvesting by rolling over the note. Most investors rolled over their notes, many for years, reinvesting their principal and, often, the purported interest they had earned during the previous term.

33.     At the end of each term, when investors decided whether to reinvest with Apostelos, Apostelos misrepresented investors' returns in renewal promissory notes by including the purported interest earned on the previous note in the principal balance of the new note. These renewal promissory notes were prepared at Apostelos's direction and signed by him. Apostelos also misrepresented some investors' returns in account statements prepared at his direction. Apostelos and WMA sent the renewal promissory notes and account statements to many investors by email.

34.     The investor funds raised through promissory notes, regardless of whether they were issued by Apostelos or by WMA, were deposited in the WMA bank accounts, which Apostelos controlled. The investor funds were then used to pay earlier investors and promoters, finance Apostelos's and his wife's other businesses, and pay for personal expenses.

35.     The promissory note offering conducted by Apostelos and WMA was not registered with the Commission and was not eligible for any exemption from registration. Apostelos and WMA offered and sold promissory notes to investors residing in Ohio and at least 23 other states and 2 foreign countries. Many of the at least 330 promissory note investors were

unsophisticated and had limited financial means, and thus were not accredited. Apostelos did not provide these non-accredited investors with any financial information for himself or WMA.

**Apostelos's and WMA's Misrepresentations to Promissory Note Investors**

36.     Between at least January 2010 and October 2014, Apostelos and WMA knowingly made several material misrepresentations and omissions to investors about the nature of the purported promissory note investments. Specifically, Apostelos: (a) falsely told investors that their money would be invested in real estate projects; (b) falsely told investors that their money would be invested in "hard money" loans to farmers, farm co-ops, or small businesses; (c) falsely told investors that their money would be invested in precious metals, such as gold or silver; and (d) falsely told investors that their money would be invested in stocks or other publicly traded investments.

37.     Apostelos and WMA knowingly omitted material facts about how investor funds would be used in oral and written representations to investors. For example, Apostelos did not disclose that, instead of investing investor funds in stocks, precious metals, real estate, or hard-money lending, Apostelos used the investor funds to pay earlier investors and promoters, finance his and his wife's other businesses, and pay for personal expenses.

38.     Apostelos knowingly misrepresented to investors that their investments had generated the returns promised over the previous note term in order to induce investors to roll over their promissory note investments and reinvest.

39.     Additionally, Apostelos falsely told some investors that he was a licensed broker or licensed to sell securities knowing these representations were false.

40.     Apostelos's and WMA's misrepresentations and omissions were material.

41.     In making the misrepresentations and omissions identified in paragraphs 36 through 39 above, Apostelos and WMA acted with *scienter*.  Apostelos personally received investor funds and exercised total control over how they were spent.  He approved all transactions in WMA's bank accounts, and thus he knew that investor funds were not being used for the purposes he described to investors and instead were being to pay earlier investors and promoters, finance his and his wife's other businesses, and pay for personal expenses.  Apostelos controlled and acted on behalf of WMA, and thus his *scienter* is imputed to WMA.

**Apostelos's Unregistered Offerings of Midwest Green Membership Units**

42.     Between July 2010 and August 2014, Apostelos raised money from investors by offering and selling membership units in Midwest Green.  These membership units, which were purportedly equity interests in Midwest Green, were securities as that term is defined in Exchange Act Section 3(a)(10) [15 U.S.C. § 78c(a)(10)] and Securities Act Section 2(a)(1) [15 U.S.C. § 77b(a)(1)].

43.     Between July 2010 and August 2014, Apostelos and Midwest Green conducted two unregistered offerings of Midwest Green membership units, during which they raised approximately $9.8 million from at least 60 investors.  These offerings were not registered with the Commission.

44.     Apostelos and Midwest Green falsely claimed that the offerings were exempt from registration in a Form D Notice of Exempt Offering of Securities signed by Apostelos and filed March 30, 2010, and in a Midwest Green private placement memorandum ("PPM") that Apostelos distributed to investors between approximately July 2010 and August 2014.

45.     In the first offering, which took place between July 16, 2010, and October 30, 2013, Midwest Green raised at least $9 million from approximately 50 investors who resided in

Ohio and at least three other states.  The investors included participants in the 401(k) plan of a Dayton-area car dealership and holders of self-directed IRA accounts.  At least two of the investors who participated in this offering were not accredited.  Apostelos and Midwest Green did not provide these non-accredited investors with audited financial information.

46.     In the second offering, which took place between June 27, 2014, and August 19, 2014, Midwest Green raised at least $693,000 from approximately 11 investors who resided in Ohio and at least one other state.  The aggregate offering price for Midwest Green securities sold within the twelve months before the start of and during the second Midwest Green offering was approximately $1.3 million.  All of the 11 investors who participated in this offering were OVO advisory clients, and at least 6 of them were not accredited.  Apostelos and Midwest Green did not provide these non-accredited investors with audited financial information.

47.     In connection with both offerings, Apostelos actively solicited and personally met with prospective investors.  Apostelos knowingly made false oral representations to investors that Midwest Green would invest in real estate and generate high, guaranteed returns.

48.     Additionally, Apostelos participated in and was responsible for the creation of the Midwest Green PPM that he distributed to prospective investors.  The PPM contained false statements about the status of Midwest Green's operations and the use of investor funds, representing that Midwest Green would use pooled investor funds to invest in real estate, land development, commercial and "hard money" loans, precious metals, commodities, and tax liens.

49.     After individuals invested, Apostelos and Midwest Green knowingly misrepresented their returns in account statements, K-1s, and on a password-protected website where investors could log in to track the purported value of their investment.  Apostelos also

signed false account valuations to be provided to the custodian of IRA funds invested in Midwest Green, which were then reflected in statements the IRA custodian issued to investors.

**Apostelos's and Midwest Green's Misrepresentations to Midwest Green Investors**

50.     In connection with both offerings of Midwest Green membership units between at least July 2010 and August 2014, Apostelos knowingly made several material misrepresentations and omissions about the nature of the investment.  Apostelos orally misrepresented various facts to prospective investors, including that:  (a) Midwest Green would invest in real estate; (b) an investment in Midwest Green would generate a guaranteed 20% monthly return; (c) an investment in Midwest Green would generate an 8% minimum annual return; and (d) Midwest Green was an FDIC-insured bank.

51.     Apostelos and Midwest Green also made material misrepresentations and omissions through the Midwest Green PPM.  Specifically, the PPM falsely represented that:  (a) Midwest Green had begun operations in 2009; (b) Midwest Green would use investor funds to invest in real estate, land development, commercial and "hard money" loans, precious metals, commodities, and tax liens; and (c) loans made by Midwest Green would be secured by real and personal property.

52.     Contrary to these representations, Apostelos knew that Midwest Green was not an FDIC-insured bank and had not begun operations before it began soliciting funds from investors in 2010.  Midwest Green never made any legitimate investment or secured loan, and instead all investor funds invested in Midwest Green were funneled to the WMA bank accounts, where they were used to pay earlier investors and promoters, finance Apostelos's and his wife's other businesses, and pay for personal expenses.

53. Apostelos's and Midwest Green's misrepresentations and omissions were material.

54. In making the misrepresentations and omissions identified in paragraphs 50 through 52 above, Apostelos and Midwest Green acted with *scienter*. Apostelos personally received investor funds and exercised total control over how they were spent. He approved the transfers of Midwest Green funds to the WMA bank account and all transactions in WMA's bank accounts, and thus he knew that investor funds were not being used for the purposes he described to investors and instead were being used to pay earlier investors and promoters, finance his and his wife's other businesses, and pay for personal expenses. Apostelos controlled and acted on behalf of Midwest Green, and thus his *scienter* is imputed to Midwest Green.

**Apostelos's Misrepresentations about the Pooled Investment Vehicle Account**

55. Between at least August 2013 and July 2014, Apostelos told some investors that he would invest their funds in publicly traded securities through a pooled investment vehicle account ("PIV Account") held at a broker-dealer that Apostelos identified by name. The broker-dealer is referred to as "BD 1"

56. BD 1, a well-known firm that is registered with the SEC as a broker-dealer, is one of the largest discount brokerages in the United States. An affiliate of BD 1 provides educational products and services to teach individuals investing concepts. One of these products is hypothetical trading software that provides students with the ability to practice investing concepts in a simulated market environment (referred to herein as the "Trading Software"). The Trading Software can be accessed online.

57. Apostelos told investors that he would pool their funds in the PIV Account, and then invest the funds in publicly traded stocks, bonds, and options. Apostelos told some of these

investors that he would earn a fee at the end of their investment. Apostelos issued some of these investors promissory notes with a one-year term guaranteeing a minimum return ranging from 7 to 25%

58. Apostelos managed the purported PIV Account and the funds of the investors in exchange for compensation in the form of fees. Apostelos was responsible for all investment decisions made on behalf of the purported PIV Account and its investors. The PIV Account was a pooled investment vehicle, and, although not registered with the SEC, Apostelos acted as an investment adviser to the PIV Account and its investors. As an investment adviser, Apostelos had a fiduciary duty to his clients.

59. In reality, Apostelos knew the PIV Account did not exist. The investors' funds were not invested in stocks or any publicly traded security. Instead, Apostelos deposited the investors' funds into WMA's bank account, where they were used to pay earlier investors and promoters, finance his and his wife's other businesses, and pay for personal expenses.

60. Apostelos knowingly made material misrepresentations and omissions to prospective investors in the PIV Account. Specifically, Apostelos falsely told investors that: (a) he would place their funds in an account held at BD 1; (b) he would invest their funds in stocks, bonds, and options; and (c) he had generated significant trading profits in the past for himself and others.

61. Apostelos also knowingly made use of the Trading Software to deceive prospective and existing investors in the PIV Account. In a meeting with at least one prospective investor, Apostelos used the Trading Software to show the prospective investor a webpage that Apostelos falsely said showed trading profits in a trading account that he managed. He did not

disclose that there was no real money associated with the account shown on the Trading Software.

62.     Apostelos also told prospective investors that they would be able to track their individual investments and returns online.  Once individuals invested, Apostelos gave them credentials they could use to login in to the Trading Software and a unique username they could use to access a webpage that Apostelos falsely said showed the performance of their investment. Some investors used the credentials provided by Apostelos to log on to the Trading Software, which appeared to show that their funds were invested in stocks and that they had earned significant returns.

63.     One investor cashed in an annuity and gave Apostelos more than $500,000 to invest in stocks through the supposed PIV Account.  Using the credentials given to her by Apostelos, she regularly tracked her returns using the Trading Software, which showed that her account value was more than $1.5 million in October 2014.

64.     Apostelos did not inform most investors that the Trading Software merely simulated stock trading and that there was no real money associated with the account shown on the Trading Software.  Apostelos did tell one investor that the Trading Software reflected simulated trading.  However, Apostelos also falsely told that investor the Trading Software tracked real-time performance of the investor's share of the PIV Account.  Apostelos knew the representation was false because he knew the PIV Account did not exist.

65.     Apostelos's misrepresentations and omissions about the PIV Account were material.

66.     In making the misrepresentations and omissions identified in paragraphs 60 through 64 above, Apostelos acted with *scienter*.  Apostelos personally received investor funds

and exercised total control over how they were spent. He approved the transfers of investor funds to the WMA bank account and all transactions in WMA's bank accounts, and thus he knew that investor funds were not being invested in publicly traded securities and instead were being used to pay earlier investors and promoters, finance his and his wife's other businesses, and pay for personal expenses.

**Apostelos's and OVO's Misrepresentations to OVO Clients**

67.     In approximately February 2013, Apostelos and three other individuals formed OVO, a state-registered investment adviser which operated from approximately April 2013 through approximately September 2014.

68.     Over the course of its existence, OVO had a total of at least 32 advisory clients, many of whom had previously invested with Apostelos or were referred by friends and family. OVO held client funds in custodial accounts through a registered broker-dealer and invested those funds in publicly traded investments through model portfolios. OVO charged its clients an asset management fee based on assets under management and collected at least $33,925 in fees over the course of its operations. As an investment adviser, OVO had a fiduciary duty to its clients.

69.     Between May 2014 and September of 2014, OVO's operations were wound down. In total, 17 OVO clients' funds were transferred to a custodian of self-directed IRAs and then to Midwest Green or to promissory notes issued by Apostelos. Additionally, funds belonging to one OVO client were transferred directly to a WMA bank account.

70.     In approximately June 2013, Apostelos knowingly made an oral misrepresentation to at least one prospective OVO advisory client ("Client A"), stating in a meeting with her that

OVO was an FDIC-insured bank. In July 2013, Client A opened three accounts with OVO that were invested in publicly traded securities.

71.     Nearly a year later, in May 2014, Apostelos knowingly made material misrepresentations and omissions to induce Client A to transfer her OVO accounts to other Apostelos investments. During in-person meetings, Apostelos advised Client A to transfer the bulk of one of her OVO accounts to a promissory note investment. Apostelos falsely stated that Client A's funds would be pooled with money raised from other investors and invested in hard-money lending and real estate. Apostelos also advised Client A to transfer another OVO account to a custodian of self-directed IRAs, where Apostelos claimed that her funds would earn a 20% annual return. In reality, the bulk of Client A's funds were transferred to the WMA bank account, where they were commingled with funds of other investors and used to pay earlier investors and promoters, finance Apostelos's and his wife's other businesses, and pay for personal expenses.

72.     In approximately June 2014, Apostelos knowingly made material misrepresentations and omissions to another OVO client ("Client B"). Apostelos advised Client B to transfer his OVO account to a self-directed IRA account to be invested in Midwest Green, which Apostelos said would generate higher returns than the stock market. Apostelos gave Client B the Midwest Green PPM, falsely told Client B that his investment in Midwest Green would be invested in real estate, and promised a 20% return. In reality, Midwest Green did not conduct any legitimate operations, and funds invested in Midwest Green were transferred to the WMA bank account and used to pay earlier investors and promoters, finance Apostelos's and his wife's other businesses, and pay for personal expenses.

73.     Apostelos's and OVO's misrepresentations and omissions were material.

74.     In making the misrepresentations and omissions identified in paragraphs 70

through 72 above, Apostelos and OVO acted with *scienter*.  Apostelos was an officer of OVO

and involved in its formation, and thus he knew that OVO was not a bank and not FDIC-insured.

Apostelos personally received investor funds and exercised total control over how they were

spent.  He approved the transfers of investor funds to the WMA bank account and all

transactions in WMA's bank accounts, and thus he knew that investor funds were not being

invested as he described and instead were being used to pay earlier investors and promoters,

finance his and his wife's other businesses, and pay for personal expenses.  Apostelos controlled

and acted on behalf of OVO, and thus his *scienter* is imputed to OVO.

**Apostelos's Misappropriation and Misuse of Investor Funds**

75.     From January 2010 to October 2014, Apostelos raised a total of at least $66.7

million in investor funds, including at least $56.9 million in investor funds deposited directly into

WMA's bank accounts (raised primarily through promissory notes) and approximately $9.8

million in investor funds raised through the sale of Midwest Green membership units and

deposited into Midwest Green's bank accounts.

76.     Apostelos did not use investor funds for the purposes he described when soliciting

new investors or advisory clients or when trying to retain them.  Apostelos did not maintain

separate "funds" for different investment purposes.  Instead, nearly all of these investor funds

were funneled into WMA's bank accounts, often within hours or days of being initially

deposited.

77.     The vast majority of the approximately $66.7 million raised from investors was

used to pay approximately $52.8 million to investors and at least $6.3 million to promoters, with

the rest used to fund Apostelos's personal expenses, including gambling expenses; fund other

businesses controlled by Apostelos and his wife, including his wife's horse racing venture; and pay day-to-day expenses.

78.     Connie Apostelos received at least $3.2 million in transfers to accounts in her name or joint accounts she held with Apostelos and his sister.  Apostelos Enterprises received at least $1.1 million.  Coleman Capital received at least $1.7 million, and Silver Bridle received at least $1 million.

79.     Apostelos did not use legitimate business revenue or investment returns to fund the approximately $52.8 million paid out to investors between January 2010 and October 2014. Instead, in classic Ponzi fashion, Apostelos used investor funds to pay purported returns and principal to other investors.

**The Scheme Collapses**

80.     Beginning in late 2012, Apostelos experienced chronic cash-flow shortages, and he began to fall behind on interest payments to investors.

81.     Between May 2014 and October 2014, several investors filed lawsuits against Apostelos and received judgments.  On October 15, 2014, a group of investors filed a petition for involuntary bankruptcy against Apostelos under Chapter 7, which is ongoing.

**COUNT I**

**Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Thereunder
[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]
(Against Apostelos, WMA, Midwest Green, and OVO)**

82.     Paragraphs 1 through 81 are realleged and incorporated by reference as if set forth fully herein.

83.     By engaging in the conduct described in paragraphs 24 through 79 above, Apostelos, WMA, Midwest Green, and OVO, in connection with the purchase and sale of

securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:

      a.     used and employed devices, schemes, and artifices to defraud;

      b.     made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c.     engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

84.     Apostelos, WMA, Midwest Green, and OVO intentionally, knowingly, or recklessly engaged in the fraudulent conduct described above.

85.     By reason of the foregoing, Apostelos, WMA, Midwest Green, and OVO violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II

### Violations of Section 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]
### (Against Apostelos, WMA, and Midwest Green)

86.     Paragraphs 1 through 81 are realleged and incorporated by reference as though fully set forth herein.

87.     By engaging in the conduct described in paragraphs 24 through 79 above, Apostelos, WMA, Midwest Green, and OVO, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

      a.     employed devices, schemes, and artifices to defraud;

      b.     obtained money or property by means of untrue statements of material fact and by omitting to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and

c.      engaged in transactions, practices, and courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

88.     In connection with their violation of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)] as set forth in paragraph 87(a) above, Apostelos, WMA, and Midwest Green, intentionally, knowingly, or recklessly engaged in the devices, schemes, and artifices described above.

89.     By reason of the foregoing, Apostelos, WMA, and Midwest Green violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT III

**Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act
[15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)]
(Against OVO)**

90.     Paragraphs 1 through 81 are realleged and incorporated by reference as though fully set forth herein.

91.     By engaging in the conduct described in paragraphs 67 through 79 above, OVO, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

a.      employed devices, schemes, and artifices to defraud; and

b.      engaged in transactions, practices, and courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

92.     In connection with its violation of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)] as set forth in paragraph 91(a) above, OVO intentionally, knowingly, or recklessly engaged in the devices, schemes, and artifices described above.

93.     By reason of the foregoing, OVO violated Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

## COUNT IV

### Violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act
### [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)]
### (Against OVO)

94.     Paragraphs 1 through 81 are realleged and incorporated by reference as if set forth fully herein.

95.     During the relevant time period, OVO acted as an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

96.     By engaging in the conduct described in paragraphs 67 through 79 above, OVO, by use of the mails and the means and instrumentalities of interstate commerce, directly or indirectly, while an investment adviser:

    a.      employed devices, schemes, and artifices to defraud clients and prospective clients;

    b.      engaged in transactions, practices, and courses of business that operated as a fraud or deceit upon clients and prospective clients; and

    c.      engaged in acts, practices, and courses of business which were fraudulent, deceptive, and manipulative.

97.     In connection with its violation of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)] as set forth in paragraph 96(a) above, OVO intentionally, knowingly, or recklessly engaged in the devices, schemes, and artifices described above.

98.     By reason of the foregoing, OVO, directly or indirectly, violated Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)].

## COUNT V

### Violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act
### and Rule 206(4)-8 Thereunder
### [15 U.S.C. §§ 80b-6(1), 80b-6(2) and 80b-6(4) and 17 C.F.R. § 275.206(4)-8]
### (Against Apostelos)

99.     Paragraphs 1 through 81 are realleged and incorporated by reference as if set forth

fully herein.

100.     During the relevant time period, Apostelos acted as an investment adviser to the

purported PIV Account and the investors therein within the meaning of Section 202(a)(11) of the

Advisers Act [15 U.S.C. § 80b-2(a)(11)].  The PIV Account was a pooled investment vehicle

within the meaning of Rule 206(4)-8(b) under the Advisers Act [17 C.F.R. § 275-206(4)-8(b)].

101.     By engaging in the conduct described in paragraphs 55 through 79 above,

Apostelos, by use of the mails and the means and instrumentalities of interstate commerce,

directly or indirectly, while an investment adviser:

        a.     employed devices, schemes, and artifices to defraud clients and
               prospective clients;

        b.     engaged in transactions, practices, and courses of business that operated as
               a fraud or deceit upon clients and prospective clients; and

        c.     engaged in acts, practices, and courses of business which were fraudulent,
               deceptive, and manipulative.

102.     By engaging in the conduct described in paragraphs 55 through 79 above,

Apostelos, by use of the mails and the means and instrumentalities of interstate commerce,

directly or indirectly, while an investment adviser to a pooled investment vehicle:

        a.     made untrue statements of material facts and omitted to state material facts
               necessary to make the statements made, in the light of the circumstances
               under which they were made, not misleading, to investors and prospective
               investors in the purported PIV Account; and

      b.      engaged in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative with respect to investors and prospective investors in the purported PIV Account.

103.    In connection with his violation of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)] as set forth in paragraph 101(a) above, Apostelos intentionally, knowingly, or recklessly engaged in the devices, schemes, and artifices described above.

104.    By reason of the foregoing, Apostelos, directly or indirectly, violated Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] thereunder.

## COUNT VI

### Violations of Section 5(a) and 5(c) of the Securities Act
### [15 U.S.C. §§ 77e(a) and 77e(c)]
### (Against Apostelos, WMA, Midwest Green, and OVO)

105.    Paragraphs 1 through 81 are realleged and incorporated by reference as if set forth fully herein.

106.    By engaging in the conduct described in paragraphs 24 through 79 above, Apostelos, WMA, Midwest Green, and OVO directly or indirectly:

      a.      made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect;

      b.      for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and

      c.      made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

107.    No valid registration statement was filed or was in effect with the Commission in connection with the offer and sale of securities by Apostelos, WMA, Midwest Green, and OVO.

108.    By reason of the foregoing, Apostelos, WMA, Midwest Green, and OVO violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT VII

### Violations of Section 15(a)(1) of the Exchange Act
### [15 U.S.C. § 78o(a)(1)]
### (Against Apostelos)

109.    Paragraphs 1 through 81 are realleged and incorporated by reference as if set forth fully herein.

110.    By engaging in the conduct described in paragraphs 24 through 79 above, Apostelos was in the business of effecting transactions in securities for the accounts of others.

111.    Apostelos made use of the mails and the means and instrumentalities of interstate commerce to effect transactions in and to induce or attempt to induce the purchase of securities.

112.    By engaging in the conduct described in paragraphs 29 through 79 above, Apostelos acted as a broker but was not registered with the Commission as a broker.

113.    By reason of the foregoing, Apostelos violated Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## COUNT VIII

### Aiding and Abetting Liability
### Under Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act
### [15 U.S.C. §§ 77o(b) and 78t(e)]
### (Against Apostelos)

114.    Paragraphs 1 through 81 are realleged and incorporated by reference as if set forth fully herein.

115.    WMA and Midwest Green violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] as described in paragraphs 82 through 89 above (Counts I and II), which are realleged and incorporated by reference as if set forth fully herein.

116.    Apostelos substantially assisted WMA and Midwest Green in the violations described above.

117.    Apostelos knew or was reckless that his role was part of an overall activity that was illegal or improper.

118.    By engaging in the conduct described in paragraphs 24 through 79 above, Apostelos aided and abetted WMA's and Midwest Green's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

119.    By reason of the foregoing, Apostelos is liable jointly and severally with and to the same extent as WMA and Midwest Green pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## COUNT IX

**Control Person Liability Under Section 20(a) of the Exchange Act**
**[15 U.S.C. § 78t(a)]**
**(Against Apostelos)**

120.    Paragraphs 1 through 81 are realleged and incorporated by reference as if set forth fully herein.

121.    Defendants WMA and Midwest Green violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] as described in paragraphs 82 through 85 above (Count I), which are realleged and incorporated by reference as if set forth fully herein.

122.     Apostelos controlled the day-to-day affairs of WMA and Midwest Green and possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of WMA and Midwest Green.  Apostelos was involved in the formulation and execution of the fraudulent acts, misrepresentations, and omissions by WMA and Midwest Green described in paragraphs 24 through 79 above.

123.     Apostelos directly or indirectly controlled WMA and Midwest Green within the meaning of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

124.     Apostelos is liable as a control person for violations of WMA and Midwest Green of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

125.     By reason of the foregoing, Apostelos is liable jointly and severally with and to the same extent as WMA and Midwest Green pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

### COUNT X
### Relief Defendants
**(Against Connie Apostelos, Apostelos Enterprises, Coleman Capital, and Silver Bridle)**

126.     Paragraphs 1 through 81 are realleged and incorporated by reference as if set forth fully herein.

127.     Connie Apostelos received at least $3.2 million in transfers of investor funds to accounts in her name or joint accounts she held with Apostelos and his sister.

128.     Apostelos Enterprises received at least $1.1 million in transfers of investor funds to its bank accounts.

129.     Coleman Capital received at least $1.7 million in transfers of investor funds to its bank accounts.

130.    Silver Bridle received at least $1 million in transfers of investor funds to its bank accounts.

131.    The proceeds identified in paragraphs 78 and 127 through 130 above are the proceeds of violations committed by Defendants Apostelos, WMA, Midwest Green, and OVO described in this Complaint.

132.    Relief Defendants Connie Apostelos, Apostelos Enterprises, Coleman Capital, and Silver Bridle have no legitimate claim to the amounts identified in paragraphs 78 and 127 through 130 above, and therefore were unjustly enriched by receiving those funds.

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining:

A.    Defendant Apostelos, his agents, servants, employees, attorneys and those persons in active concert or participation with him who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)]; Sections 10(b) and 15(a)(1) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)(1)] and Rule 10b-5 thereunder [17 CFR § 240.10b-5]; and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8

thereunder [17 C.F.R. § 275.206(4)-8];

B. Defendants WMA and Midwest Green, their successors, officers, agents, servants, employees, attorneys and those persons in active concert or participation with WMA and Midwest Green who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 CFR § 240.10b-5]; and

C. Defendant OVO, its successors, officers, agents, servants, employees, attorneys and those persons in active concert or participation with OVO who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 CFR § 240.10b-5]; and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)].

## III.

Issue an Order requiring Defendants and Relief Defendants to disgorge the ill-gotten gains received as a result of the violations alleged in this Complaint, including prejudgment interest.

## IV.

With regard to Defendants' violative acts, practices, and courses of business set forth herein, issue an Order imposing upon Defendants appropriate civil penalties pursuant to Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other relief as this Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission hereby requests a trial by jury.

Respectfully submitted,

s/ Meredith Jenkins Laval
Meredith Jenkins Laval, Trial Attorney
John E. Birkenheier, Trial Attorney
Amy S. Cotter
**U.S. SECURITIES AND EXCHANGE COMMISSION**
175 West Jackson Boulevard, Suite 900
Chicago, Illinois  60604
Telephone:  (312) 596-6051
Facsimile:   (312) 353-7398
Email: lavalm@sec.gov
              birkenheierj@sec.gov
              cottera@sec.gov

*Attorneys for Plaintiff*

Dated:  October 29, 2015