**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| UNITED STATES SECURITIES | : | |
| AND EXCHANGE COMMISSION, | : | Case No. 1:15-cv-00699 |
| | : | |
| Plaintiff, | : | Judge Thomas M. Rose |
| | : | |
| v. | : | |
| | : | |
| WILLIAM M. APOSTELOS, *et al.*, | : | |
| | : | |
| Defendants. | : | |

_____

**ENTRY AND ORDER GRANTING PLAINTIFF UNITED STATES
SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY
JUDGMENT AGAINST DEFENDANT WILLIAM M. APOSTELOS (DOC. 52),
IMPOSING RELIEF, AND TERMINATING THE CASE**
_____

This case is before the Court on the Motion for Summary Judgment (Doc. 52) (the "Motion") filed by Plaintiff United States Securities and Exchange Commission ("SEC"), pursuant to Fed. R. Civ. P. 56. Specifically, the SEC moves for summary judgment as to Counts I, II, V, VI, VII, VIII, and IX asserted against Defendant William M. Apostelos ("Apostelos") in the Complaint (Doc. 1). The SEC's overarching argument is that it is entitled to summary judgment based on the preclusive effect of the judgment entered by this Court against Apostelos in a parallel criminal case, *United States v. Apostelos*, No. 3:15-cr-00148 (S.D. Ohio) (the "Criminal Action") and undisputed evidence of Apostelos' fraud. Apostelos, who is a currently incarcerated *pro se* defendant, filed a memorandum in opposition to the Motion (Doc. 61) (the "Opposition"), and the SEC filed a reply memorandum in support of the Motion (Doc. 62) (the "Reply"). The Motion is fully briefed and ripe for review. (Docs. 52, 61, 62.) For the reasons discussed below, the Court **GRANTS** the Motion, **IMPOSES RELIEF** as set forth below, and **TERMINATES** this case.

1

# I.    BACKGROUND

On October 29, 2015, the SEC filed its Complaint in this civil action against Defendants Apostelos, WMA Enterprises, LLC ("WMA"), Midwest Green Resources, LLC ("Midwest Green"), and OVO Wealth Management, LLC ("OVO") (collectively, "Defendants"), and against Relief Defendants Connie Apostelos ("Connie"), Apostelos Enterprises, Inc. ("Apostelos Enterprises"), Coleman Capital, Inc. ("Coleman Capital"), and Silver Bridle Racing, LLC ("Silver Bridle") (collectively, "Relief Defendants").  (Doc. 1.)

## A.  Claims Brought Against Apostelos by the SEC

In the Complaint, the SEC alleges that Apostelos violated various securities laws by operating a fraudulent scheme that involved, among other things, making numerous false and misleading statements to hundreds of investors, as well as selling unregistered securities and acting as an unregistered broker.  The specific claims brought against Apostelos are the following:

- Count I – Violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 Thereunder (17 C.F.R. § 240.10b-5)

- Count II – Violations of Section 17(a) of the Securities Act (15 U.S.C. § 77q(a))

- Count V – Violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act (15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)) and Rule 206(4)-8 Thereunder (17 C.F.R. § 275.206(4)-8)

- Count VI – Violations of Sections 5(a) and 5(c) of the Securities Act (15 U.S.C. §§ 77e(a) and 77e(c))

- Count VII – Violations of Section 15(a)(1) of the Exchange Act (15 U.S.C. § 78o(a)(1))

- Count VIII – Aiding and Abetting Liability Under Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act (15 U.S.C. § 77o(b) and 78t(e))

- Count IX – Control Person Liability Under Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a))

(Doc. 1.)

**B. Apostelos' Guilty Plea and Conviction on Certain Criminal Charges**

On October 29, 2015 (the same day that the SEC filed the Complaint), the United States Attorney for the Southern District of Ohio filed an indictment against Apostelos. (Criminal Action Doc. 6.) The indictment alleges, among other things, that Apostelos "knowingly and intentionally conspired to devise, execute, and participate in a scheme to defraud investors and to obtain money and property owned by and under the custody and control of investors, by means of materially false and fraudulent pretenses, representations, and promises, and the non-disclosure and concealment of material facts …." (*Id*. at PAGEID # 42.) The criminal indictment is predicated on much of the same conduct that forms the basis of the SEC's Complaint in this civil case. (*Compare* Criminal Action Doc. 6 *to* Doc. 1.)

On December 15, 2016, Apostelos signed a Plea Agreement,[1] pursuant to which he pleaded guilty to one count of conspiracy to commit wire and mail fraud in violation of 18 U.S.C. § 1349 (Criminal Action Count One) and one count of conversion of funds from an employee benefits plan in violation of 18 U.S.C. § 664 (Criminal Action Count Twenty-Four). (Criminal Action Doc. 58.) Exhibit A to the Plea Agreement is a "Statement of Facts for Williams Apostelos," which Apostelos signed as being "AGREED AND ACCEPTED" and which states the following:

> Between 2010 and October 2014, in the Southern District of Ohio, defendant William Apostelos, with the intentional help of other people, knowingly ran a fraudulent investment scheme that caused millions of dollars in losses to certain of its investors. Throughout this time, Mr. Apostelos oversaw the operations of WMA Enterprises ('WMA') and Midwest Green Resources ('Midwest Green') – purported investment companies located in the Dayton, Ohio metropolitan area.
>
> Using these companies, Mr. Apostelos convinced hundreds of individuals from around the country to place millions of dollars in assets under his control for the purpose of investment. In doing so, Mr. Apostelos often intentionally misrepresented the manner in which he intended to use his clients' money. For instance, he falsely assured multiple clients that he planned to invest their money

---

[1] The Plea Agreement qualifies as admissible hearsay pursuant to Fed. R. Evid. 803(22) of which this Court may take judicial notice pursuant to Fed. R. Evid. 201. *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995).

in, among other things: the stock market; precious metals such as gold and silver; as well as real estate developments in Kentucky and Nevada. Mr. Apostelos further falsely agreed to provide his clients with periodic statements or information that accurately reflected the status of their investments.

Based on these intentional misstatements and misrepresentations, hundreds of individuals transferred millions of dollars – often through interstate wires – to Mr. Apostelos with the understanding that he would make bona fide investments with their money. For these same reasons, at least one entity transferred management of its employee pension benefit plan – identified herein by the acronym B.T.F., Inc., 401K Plan – to Mr. Apostelos.

Rather than investing as promised the bulk of this money that he received, Mr. Apostelos with the intentional help of other individuals knowingly diverted his clients' money – including the assets of the B.T.F., Inc., 401K Plan – for improper and unauthorized uses. For example, Mr. Apostelos knowingly and improperly used client funds intended for investment in the stock market to repay earlier investors in his scheme. Similarly, without authorization, he purposefully and fraudulently diverted portions of investors' money to: pay his own employees; to fund the horse racing business of his wife; and to purchase real property for himself and his family such as 35 Commercial Way, Springboro, Ohio.

To prevent detection of his intentional misuse of investors' funds – including the assets of the B.T.F., Inc., 401K Plan – Mr. Apostelos and other individuals worked together to provide false information to clients of WMA and Midwest Green. On occasion, Mr. Apostelos directed his employees to prepare and to mail statements that fraudulently described the purported positive growth of investors' funds. Additionally, when certain clients attempted to withdraw their investments from WMA and Midwest Green, Mr. Apostelos often directed his employees to provide these investors with intentionally inaccurate reasons for his inability to repay them, such as false claims that the companies' bank accounts had been hacked.

Based on this fraudulent conduct, Mr. Apostelos and others caused many of the investors to lose funds collectively totaling in the millions of dollars.

(*Id*. at PAGEID # 281-82.)

This Court accepted Apostelos' guilty plea on February 10, 2017. (Criminal Action Doc. 59.) On June 30, 2017, this Court sentenced him to 180 months in prison and ordered him to pay restitution in the amount of $32,767,578.72 and forfeit assets traceable to the offenses for which he was convicted. (Criminal Action Doc. 81.)

**C. Investor Funds and Lack of Registration by Apostelos, WMA, and Midwest Green**

Attached as an exhibit to the SEC's Motion is a Declaration of Luz M. Aguilar ("Aguilar Decl."). (Doc. 52-2.) Mr. Aguilar is a Senior Accountant with the SEC who participated in the SEC's investigation regarding the offer and sale of investments by Apostelos and his entities (WMA, Midwest Green, and OVO). (*Id.*) Among other things, Mr. Aguilar reviewed numerous documents and analyzed records that show the flow of funds through accounts held by Apostelos and his entities at various financial institutions. (*See* Doc. 52-2, 52-3.)

In his Declaration, Mr. Aguilar states that, based on his review and analysis, "[f]unds from investors were deposited and pooled in accounts in the name of Midwest Green and WMA, which were controlled by Apostelos. Apostelos used funds raised from investors to make payments to previous investors, fund his personal expenses, and make payments to the Relief Defendants." (Doc. 52-2 at PAGEID # 351.) Mr. Aguilar states that "[f]rom at least November 2010 through at least October 2014, Apostelos used accounts he controlled to deposit approximately $60.4 million from investors. From at least November 2010 through at least November 2014, investors received approximately $49.2 million from accounts controlled by Apostelos which held investor funds. Apostelos used his entities to raise a net amount from investors of approximately $11.2 million ($60.4 million raised from investors less $49.2 million paid to investors). (*Id.* at PAGEID # 351-52.) Mr. Aguilar calculated prejudgment interest on the approximately $11.2 million net amount Apostelos raised from investors to be $587,371.04. (*Id.* at PAGEID # 352; *see also* Doc. 52-3 at PAGEID # 357-75.) He attaches documentation to support his calculations. (*Id.*)

Mr. Aguilar also states in his Declaration that he conducted a search of the BrokerCheck database maintained by the Financial Industry Regulatory Authority ("FINRA"), and that the search did not return any records indicating that Apostelos was registered as a broker or dealer (or associated with a registered broker or dealer) or that WMA, Midwest Green, or OVO were

registered as brokers or dealers. (Doc. 52-2 at PAGEID # 354; *see also* Doc. 52-3 at PAGEID # 404-07 (search results).) Additionally, the SEC attached to its Motion two Attestations certifying that searches of records and files do not disclose that any registration statements have been received by the SEC in the name of WMA or Midwest Green. (Docs. 52-4, 52-5.)

Apostelos does not refute, or even attempt to refute, any of the statements in Mr. Aguilar's Declaration, and he did not submit any declaration or affidavit in support of his Opposition.

## II.    LEGAL STANDARD ON SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (*quoting* Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there

is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id*. The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id*.

In ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). The Court relies on the Rule 56 evidence called to its attention by the parties. *See* Fed. R. Civ. P. 56(c), (e).

### III.    ANALYSIS

In support of its Motion, the SEC argues that the material issues necessary to resolve its claims against Apostelos were finally determined and adjudicated against Apostelos as a result of his criminal conviction. (Doc. 52 at PAGEID # 330.) According to the SEC, even putting aside the doctrine of collateral estoppel, this Court should grant summary judgment in its favor because the material facts have been admitted by Apostelos. (*Id*.) This is because, in his Plea Agreement, Apostelos admitted to knowingly and intentionally making material and fraudulent

misrepresentations to investors in an effort to induce them to invest money with him, through WMA and Midwest Green, for the purported purpose of investing in the stock market, precious metals, and real estate development.

In response, Apostelos does not actually dispute the material facts that the SEC says are dispositive for purposes of the Motion.[2] (*See* Doc. 61.) Instead, he makes five substantive arguments in opposition to the Motion—most of which attack the validity of his Plea Agreement. (*Id.*) The Court addresses each of those five arguments within its analysis below.

> **A. The SEC is Entitled to Summary Judgment on Counts I, II, and V – Violations of Section 10(b) of the Exchange Act (and Rule 10b-5 thereunder), Section 17(a) of the Securities Act, and Sections 206(1), (2), and (4) of the Advisors Act (and Rule 206(4)-8 thereunder).**

> **(1) Application of collateral estoppel**

It is well-established that "a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding." *Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 568 (1951); *see also United States v. Podell*, 572 F.2d 31, 35 (2d Cir. 1978) ("It is well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes an estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case."). Collateral estoppel applies when four requirements are met:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 650 (6th Cir. 2007). A guilty plea is an

---

[2] "If a party … fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: … (2) consider the fact undisputed for purposes of the motion; [or] (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it …" Fed. R. Civ. P. 56(e)(2), (3).

admission that binds the defendant who makes it. *Scholes*, 56 F.3d at 762 ("[J]ust as an affidavit in which a witness tries to retract admissions that he made earlier in his deposition is normally given no weight in a summary judgment proceeding, so a witness should not be permitted by a subsequent affidavit to retract admissions in a plea agreement. Admissions—in a guilty plea, as elsewhere—are admissions; they bind a party; and the veracity safeguards surrounding a plea agreement that is accepted as the basis for a guilty plea and resulting conviction actually exceed those surrounding a deposition.") (internal citations omitted).

Courts, including courts in this circuit, have entered summary judgment based on convictions for crimes other than securities fraud when the factual determinations underlying those convictions are sufficient to establish civil violations of the securities laws. *See, e.g., SEC v. Bravata*, 3 F. Supp. 3d 638, 657 (E.D. Mich. 2014) (granting summary judgment on Section 17(a), Section 10(b), and Rule 10b-5 claims based on defendants' convictions for conspiracy and wire fraud); *SEC v. Pace*, 173 F. Supp. 2d 30, 30-33 (D.D.C. 2001) (granting summary judgment on Section 17(a), Section 10(b), Rule 10b-5, and Section 14(a) claims based on defendant's conviction for wire fraud and tax fraud). This also includes civil cases where the defendant being sued for securities fraud-based claims had been criminally convicted for intentionally defrauding investors. *See, e.g., SEC v. Svoboda*, 409 F. Supp. 2d 331, 339 (S.D.N.Y. 2006) (granting summary judgment for the SEC); *SEC v. C.J.'s Financial*, No. 10-13083, 2012 WL 3600239 (E.D. Mich. July 30, 2012), *adopted by* 2012 WL 3597644 (E.D. Mich. Aug. 21, 2012) (same); *SEC v. Quinlan*, No. 02-60082, 2008 WL 4852904 (E.D. Mich. Nov. 7, 2008), *aff'd*, 373 F. App'x 581 (6th Cir. 2010) (same).

Here, all four elements necessary to apply collateral estoppel are present. <u>First</u>, as explained in this Order, this case presents the same issues and underlying facts that were raised

and litigated in the Criminal Action. (*Compare* Doc. 1 *to* Criminal Action Docs. 6 and 58.) The facts underlying Apostelos' criminal conviction, which he admitted in his Plea Agreement, are the same facts at issue in this proceeding. (*Compare* Doc. 1 *to* Criminal Action Doc. 58.) The Judgment against Apostelos in the Criminal Action, based on his own guilty plea, demonstrates that the facts encompassing his fraudulent schemes were actually litigated and decided against him. (Criminal Action Docs. 58, 81.) Apostelos does not argue otherwise. *See Bravata*, 3 F. Supp. 3d at 657 (applying collateral estoppel where defendants were convicted of conspiracy to commit wire and mail fraud involving the same factual circumstances in civil case alleging securities law violations).

Second, by accepting his plea and finding him guilty of committing conspiracy to commit wire and mail fraud and conversion of funds from an employee benefits plan, this Court determined that Apostelos' conduct satisfied each element of the crimes for which he was convicted. Based on the facts admitted by Apostelos, it was determined that: (1) he intentionally devised a scheme to defraud investors and potential investors in order to obtain their money for the purported purpose of investing in securities; (2) the scheme included the misrepresentation or concealment of a material fact; and (3) he used communications in interstate commerce in furtherance of the scheme (*see* Criminal Action Doc. 58). 18 U.S.C. § 1341, 1343; *see also Quinlan*, 2008 WL 4852904, at *5 (granting summary judgment on the basis of the collateral estoppel effect of defendant's guilty plea because "[d]efendant's misrepresentation and securities fraud were essential to his criminal conviction [for conspiracy to commit mail, wire, and bank fraud and making false statements in a manner within the jurisdiction of a federal agency], and the same conduct[] also constitute[s] the basis for the instant civil action. This is all that is necessary."). Again, Apostelos does not argue otherwise.

Third, Apostelos' guilty plea resulted in a final judgment on the merits in the criminal proceeding. (Criminal Action Doc. 81.) Apostelos' second substantive argument in his Opposition is that "summary judgement [sic] should not be granted when the Defendant intends to file a motion to correct, and/or set aside his Guilty plea and conviction in his criminal case." (Doc. 61 at PAGEID # 802.) Apostelos does not cite to any authority for this argument besides the paragraph's heading of "28 U.S.C.S. §2255," a statute that provides a prisoner in custody the ability to attack his sentence by moving to vacate, set aside, or correct his sentence. Instead of legal authority, Apostelos bases his argument on an assertion that, should he be successful on such a motion, "then a summary judgment based upon said [g]uilty plea would then also need to be set aside." (*Id.*) However, caselaw supports that a prisoner's motion under 28 U.S.C. §2255 would not prevent this Court from ruling in the SEC's favor on its motion for summary judgment. *See Quinlan*, 2008 WL 4852904, at *5 (explaining that neither a direct appeal, nor a pending petition for habeas corpus relief, affects the determination that a final judgment on the merits was rendered in the prior criminal proceeding for purposes of finding that collateral estoppel was warranted to prevent the defendant from attempting to relitigate the fraudulent conduct, his knowledge thereof, or his participation therein); *Smith v. SEC*, 129 F.3d 356, 362 n.7 (defendant's appeal of judgment in criminal case did not deprive the judgment of res judicata effect or affect its status as a "final judgment" for purposes of a collateral estoppel analysis).

Regardless, while the Motion was pending, Apostelos did file a 28 U.S.C. § 2255 motion in the Criminal Action (Criminal Action Docs. 131, 139), but then moved to dismiss his action for relief pursuant to 28 U.S.C. § 2255 (Criminal Action Doc. 146); the Court granted Apostelos' motion to dismiss his action. (*See* Criminal Action Docs. 147, 148.) Therefore, Apostelos'

argument also is moot.[3]

Fourth, Apostelos had a full and fair opportunity to litigate the issues in the Criminal Action. His "guilty plea incorporated the actual litigation and decision of those underlying issues." *SEC v. Freeman*, 290 F. Supp. 2d 401, 405 (S.D.N.Y. 2003). Facing criminal penalties, including a prison sentence, Apostelos had every incentive to litigate and defend himself, but "he elected to plead guilty, thereby accepting the truth of the charges brought against him." *Id*.

Apostelos' arguments do not preclude application of collateral estoppel here. Apostelos' first and third substantive arguments in his Opposition attack his Plea Agreement. First, he argues that "the Government is prohibited from using the plea agreement and testimony received at Defendant's change of plea hearing by the theory of" judicial estoppel. He cites to the Supreme Court's decision in *New Hampshire v. Maine*, 532 U.S. 742 (2001). In that case, the Supreme Court explained that judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Id*. at 749. "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Id*.

The Supreme Court in *New Hampshire* explained that several factors typically inform the decision of whether to apply judicial estoppel in a particular case: (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) "courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or

---

[3] Additionally, Apostelos filed an appeal of the judgment in the Criminal Action, and the Sixth Circuit Court of Appeals subsequently dismissed that appeal. (Criminal Action Docs. 84, 102.)

the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposition party if not estopped." *New Hampshire*, 532 U.S. at 750-51 (internal quotation marks omitted). The Supreme Court emphasized that these factors are not "inflexible prerequisites or an exhaustive formula for determining the application of judicial estoppel" and that "[a]dditional considerations may inform the doctrine's application in specific factual contexts." *Id*. at 751.

Apostelos bases his judicial estoppel argument on a sentence in the U.S. Attorney's (not the SEC's) "Motion for Leave to Intervene and For Stay of Discovery Pending Resolution of Parallel Criminal Proceedings." (Doc. 61 at PAGEID # 799-800; Doc. 20.) He specifically points to a sentence in the U.S. Attorney's motion that states: "The United States' proposed stay would not prejudice any of the defendants in the civil case." (Doc. 20 at PAGEID # 103.) Apostelos argues that the SEC is now improperly and unfairly using his Plea Agreement—evidence that (he argues) would not be available now "but for the requested stay." (Doc. 61 at PAGEID # 801.)

A fatal flaw in Apostelos' argument is that, as the SEC points out in its Reply, he does not, and cannot, identify any contradictory arguments made by the SEC with regard to the stay. The statement that Apostelos takes issue with was made by the U.S. Attorney, not the SEC; the SEC did not seek, nor oppose, the entry of a stay in this case. (*See* Doc. 21.) Judicial estoppel is not applicable. *New Hampshire*, 532 U.S. at 749.

In his third substantive argument in opposition to the Motion, Apostelos argues that "he can and will argue that he was proceeding 'on advice of counsel' and that based upon the advice of counsel he did not 'willingly' commit any of the conduct alleged by the" SEC. (Doc. 61 at PAGEID # 802.) However, as the SEC points out, Apostelos fails to set forth facts that would establish the elements of an advice of counsel defense: "(1) full disclosure of all pertinent facts to

counsel, and (2) good faith reliance on counsel's advice." *United States v. Lindo*, 18 F.3d 353, 356 (6th Cir. 1994). He fails even to identify the counsel and the issue(s) on which counsel provided advice. Additionally, Apostelos omits that he "agreed and accepted" the "Statement of Facts" quoted above that was part of his Plea Agreement; the "Statement of Facts" contains numerous admissions that establish Apostelos' knowing involvement in the fraudulent scheme. (Criminal Action Doc. 58 at PAGEID # 281-82.) *C.f. United States v. Erickson*, 601 F.2d 296, 305 (7th Cir. 1979) ("If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negative the existence of the requisite intent or establish good faith reliance"); *United States v. Geiger*, 303 F. App'x 327, 330 (6th Cir. 2008) ("It is elementary that a wrongdoer may not steal from another and escape criminal liability because his lawyer did not tell him that stealing is wrong.").

### (2) Consideration of Counts I, II, and V

As referenced above, Counts I, II, and V allege that Apostelos violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (Count I), Section 17(a) of the Securities Act (Count II), and Sections 206(1), (2), and (4) of the Advisers Act and Rule 206(4)-8 thereunder (Count V). The SEC argues that the application of collateral estoppel based on Apostelos' Plea Agreement and convictions in the Criminal Action entitle it to summary judgment on these three counts.

Regarding Counts I and II, to establish a violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act (including Rule 10b-5), the SEC must prove that the defendant engaged in: "(1) misrepresentations or omissions of material facts (2) made in connection with the offer, sale or purchase of securities (3) with scienter on the part of the defendants." *SEC v. George*, 426 F.3d 786, 792 (6th Cir. 2005). The Supreme Court has defined

"scienter" as a "mental state embracing [the] intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

Here, all of the elements for those two counts have been adjudicated by Apostelos' guilty plea and conviction in the Criminal Action. First, Apostelos made material misrepresentations of fact to investors and potential investors. Specifically, he admitted that he falsely told investors and potential investors that he planned to invest their money in, among other things, the stock market, precious metals, and real estate developments, when, in reality, he knowingly diverted those funds for improper and unauthorized uses. (Criminal Action Doc. 58 at PAGEID # 281-82.) Second, Apostelos made those misrepresentations in connection with the offer, purchase, and/or sale of securities. In his Plea Agreement, Apostelos admitted that he told potential investors he planned to invest their money in, among other things, the stock market. (*Id.*) Additionally, Apostelos admitted that he made misrepresentations to convince potential investors to invest their money through WMA and Midwest Green. (*Id.*) As explained below, the investments in WMA and Midwest Green fall within the definition of securities. Third, Apostelos acted with scienter. He admitted that he "knowingly ran a fraudulent investment scheme," "intentionally misrepresented the manner in which he intended to use his client's money," made other "intentional misstatements and misrepresentations," and "purposefully and fraudulently diverted portions of investors' money." (*Id.*) Additionally, Apostelos used the instrumentalities of interstate commerce to carry out his fraud, as was necessarily determined in connection with his criminal conviction. He admitted in his Plea Agreement that he received investor funds through interstate wires and directed his employees to send fraudulent account statements to investors (who were from around the country) through the mail. (*Id.*)

Regarding Count V, to establish a violation of Sections 206(1), (2), and (4) of the Advisers

Act, the SEC must prove that an "investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, (1) … employ[ed] any device, scheme, or artifice to defraud any client or prospective client; (2) … engage[d] in any transaction, practice, or course of business which operate[d] as a fraud or deceit upon any client or prospective client; … or (4) engage[d] in any act, practice, or course of business which [was] fraudulent, deceptive, or manipulative." 15 U.S.C. §§ 80b-6(1), (2), (4).[4] "Facts showing a violation of Section 17(a) [of the Securities Act] or 10(b) [of the Exchange Act] by an investment adviser will also support a showing of a Section 206 violation." *SEC v. Young*, Civ. Action No. 09-1634, 2011 WL 1376045, at *7 (E.D. Pa. Apr. 12, 2011) (internal quotation marks omitted).

Here, the Plea Agreement and undisputed facts establish that Apostelos was acting as an "investment adviser." Section 202(a)(11) of the Advisers Act defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others … as to the value of securities or as to the advisability of investing in, purchasing, or selling securities … [subject to certain exceptions not applicable here]." 15 U.S.C. § 80b-2(a)(11). Apostelos admitted that he raised money from his victims based on promises that he would invest the money for them in, among other things, stocks. (Criminal Action Doc. 58 at PAGEID # 281-82.) He likewise admitted that he oversaw the operations of WMA and Midwest Green, two purported investment companies, and controlled assets clients placed in those companies. (*Id.*; *see also* Aguilar Decl. at

---

[4] Rule 206(4)-8 provides that "It shall constitute a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of section 206(4) of the [Advisers] Act (15 U.S.C. 80b-6(4)) for any investment adviser to a pooled investment vehicle to: (1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or (2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle." 17 C.F.R. § 275.206(4)-8(a). A pooled investment vehicle includes an investment company as defined in Section 3(a) of the Investment Company Act of 1940, which includes an issuer that holds itself out as being engaged primarily in the business of investing or trading in securities. *Id.* at § 275.206(4)-8(b); 15 U.S.C. § 80a-3(a).

¶7 (money invested with WMA and Midwest Green was pooled in accounts controlled by Apostelos).) Apostelos also admitted that he used investors' money for personal expenses, and there is no dispute that he received compensation in the form of investors' money. (Criminal Action Doc. 58 at PAGEID # 281-82; Aguilar Decl. at ¶7.) These admissions establish that Apostelos was engaged for compensation in the business of advising others as to investments in securities. Additionally, as referenced above, he admitted through his Plea Agreement: that he "knowingly ran a fraudulent investment scheme," "intentionally misrepresented the manner in which he intended to use his client's money," made other "intentional misstatements and misrepresentations," "purposefully and fraudulently diverted portions of investors' money," and received investor funds through interstate wires and directed his employees to send fraudulent account statements to investors (who were from around the country) through the mail. (Criminal Action Doc. 58 at PAGEID # 281-82.)

Apostelos makes no argument to the contrary. However, he does argue that an alleged "material fact" should preclude entry of summary judgment. Specifically, he argues that the litigation position in a separate action by the company whose employee benefits plan he pleaded guilty to converting funds from creates "a material fact in dispute that should be weighted [sic] by a trier of facts." (Doc. 61 at PAGEID # 804.) Specifically, Apostelos says: "[i]nterestingly [the company] has denied that there was an illegal conversion of funds, and on information and belief, they contend that the investments were legitimate." (*Id*.) In support, Apostelos simply cites the case number from a state court case whose docket runs for several pages, without citation to a document where the company made such a denial or contention. (*Id*.)

The Court has been unable to locate the alleged denial or contention by the company. *InterRoyal Corp.*, 889 F.2d at 111 ("[a] district court is not … obligated to wade through and

search the entire record for some specific facts that might support the nonmoving party's claim."). Regardless, however, Apostelos is mistaken that such a denial or contention would be a "material fact" precluding summary judgment. The state court case that Apostelos cites was filed <u>after</u> Apostelos pleaded guilty to the criminal conversion charge. Also, in that state court case, the plaintiffs claimed that they were "Net-Losers" from Apostelos' "Ponzi-Scheme" and that the defendants—which include the company—were among the "Net-Winners" of the scheme and allegedly received considerable money in excess of what they had invested with Apostelos. (*See* Complaint in *Cruz, et al. v. Beau Townsend Ford, Inc. 401(k) Plan, et al.*, Case No. 2018 CV 00926, Montgomery County, Ohio Court of Common Pleas.) The defendants in that case argued that they too were innocent victims of Apostelos' scheme, refer to Apostelos' transfers as "fraudulent," and even rely on the admissions in Apostelos' Plea Agreement to defend themselves. (*See, e.g.,* "Motion to Dismiss Plaintiffs' Claims Against Defendants, Beau Townsend Ford, Inc. 401(k) Plan, Jamie Spencer, Lee Miracle, and Dian Meyer" in *Cruz, et al. v. Beau Townsend Ford, Inc. 401(k) Plan, et al.*, Case No. 2018 CV 00926, Montgomery County, Ohio Court of Common Pleas.)

Apostelos points to no law that would support his argument that the non-party's litigation position in a separate, subsequent litigation creates a genuine issue of material fact in light of the binding admissions in his guilty plea. *Scholes*, 56 F.3d at 762; *see also Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (the party opposing a motion for summary judgment "must make an affirmative showing with proper evidence in order to defeat the motion" once the movant has met its initial burden; "Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial," and "[c]onclusory statements unadorned with supporting facts are

insufficient to establish a factual dispute that will defeat summary judgment").

Accordingly, the SEC is entitled to summary judgment against Apostelos on Counts I, II, and V.

### B. The SEC is Entitled to Summary Judgment on Counts VIII and IX – Aiding and Abetting and Control Personal Liability for Violations of WMA and Midwest Green.

Count VIII alleges that Apostelos aided and abetted violations by WMA and Midwest Green of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. Count IX alleges that Apostelos is liable as a control person under Section 20(a) of the Exchange Act for violations by WMA and Midwest Green of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. The SEC once again argues that Apostelos' Plea Agreement and convictions in the Criminal Action entitle it to summary judgment on these counts.

Regarding Count VIII, to establish aiding and abetting liability, the SEC must show (1) an underlying securities law violation by another party; (2) that the alleged aider and abettor was generally aware that his role was part of an overall activity that was illegal or improper; and (3) that the alleged aider and abettor knowingly and substantially assisted the violation. *SEC v. Washington Cnty. Util. Dist.*, 676 F.2d 218, 225-26 (6th Cir. 1982); *see also* 15 U.S.C. §§ 77o(b), 78t(e). Regarding Count IX, to establish control person liability under Section 20(a) of the Exchange Act, the SEC must show (1) an underlying securities law violation by another party; and (2) that the defendant directly or indirectly controlled the violator. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696-97 (6th Cir. 2004) (*abrogated, in part, on other grounds by Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011)). "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." *Id.*; *see also* 17 C.F.R. § 230.405, 240.12b-2.

Apostelos' admissions in his Plea Agreement establish that: (1) WMA and Midwest Green, through Apostelos, violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act (and Rule 10b-5 thereunder); (2) Apostelos is liable as a control person of WMA and Midwest Green because he directed their operations generally and their fraudulent activity specifically; and (3) Apostelos aided and abetted the violations of WMA and Midwest Green by knowingly and substantially assisting the violations while aware that his activity was part of a fraudulent scheme. (*See* Criminal Action Doc. 58 at PAGEID # 281-82.) In the Plea Agreement, Apostelos admitted that he "oversaw the operations of" WMA and Midwest Green, convinced potential investors to invest through those companies by making misrepresentations about the use of investors' funds, and controlled assets that investors placed with those companies. (*Id.*) He also admitted that he and other individuals working at his direction intentionally provided false information to clients of WMA and Midwest Green to prevent those clients from detecting his misuse of their funds and explain their inability to withdraw their investments from WMA and Midwest Green. (*Id.*) Apostelos' conduct and scienter can be imputed to WMA and Midwest Green because he controlled them and acted on their behalf. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1089 n.18 (2d Cir. 1972). Once again, Apostelos makes no argument to the contrary. *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009) ("The failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.").

Accordingly, the SEC is entitled to summary judgment against Apostelos on Counts VIII and IX.

**C. The SEC is Entitled to Summary Judgment on Count VI – Violation of Sections 5(a) and 5(c) of the Securities Act.**

Count VI alleges that Apostelos violated Sections 5(a) and 5(c) of the Securities Act by engaging in an unregistered offering of securities. "Sections 5(a) and 5(c) of the Securities Act

together require that securities be registered before they can be sold or offered for sale." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 328 (6th Cir. 2013).

A *prima facie* case for a violation of Section 5 is established by showing that: (1) no registration statement was in effect for the security; (2) the defendant, directly or indirectly, sold or offered to sell the security; and (3) interstate transportation or communication were used in connection with the offer or sale. *Bravata*, 3 F. Supp. 3d at 659; *SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923, 938-39 (S.D. Ohio 2009), *aff'd*, 712 F.3d 321 (6th Cir. 2013). Once the SEC establishes a *prima facie* violation, the defendant assumes the burden of proving that the security qualifies for a registration exemption. *SEC v. Ralston-Purina Co.*, 346 U.S. 119, 126 (1953). Scienter is not required to prove a violation of Section 5. *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004); *Sierra Brokerage Servs.*, 608 F. Supp. 2d at 939.

Section 2(a)(1) of the Securities Act defines "security" to include, among other things, "investment contracts." 15 U.S.C. § 77b(a)(1). An investment contract exists where a person makes "an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Stone v. Kirk*, 8 F.3d 1079, 1085 (6th Cir. 1993) (internal quotations omitted). "The test is a flexible one, capable of adaption to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* (internal quotations omitted). Demonstrating that an investment is a common venture requires a seller and buyer and "that [the] funds of two or more investors … go into a common pool from which all may benefit." *Id.* (internal quotations omitted); *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 394 (6th Cir. 1989).

Here, Apostelos admitted in his Plea Agreement that he convinced hundreds of investors from across the country to invest money with him through WMA and Midwest Green, with many

of those investments transferred through interstate wires. (*See* Criminal Action Doc. 58 at PAGEID # 281-82.) He also admitted that he told investors that he would use the funds they invested through WMA and Midwest Green to invest in the stock market, precious metals, and real estate developments. (*Id.*) The funds were commingled with those of other investors in WMA's and Midwest Green's bank accounts. (Aguilar Decl. (Doc. 52-2) at ¶¶5, 7.) The investments in WMA and Midwest Green fall within the definition of an investment contract, and it is undisputed that neither the securities nor their offerings were ever registered with the SEC (*see* Docs. 52-4, 52-5). *See Stone*, 8 F.3d at 1085; *Bravata*, 3 F. Supp. 3d at 660.

Apostelos does not argue or show otherwise. Instead, he argues—without citation—that the Defendants "were qualified for an exemption to the S.E.C. requirements, and said exemption was approved and sanctioned by The State of Ohio on the Edgar Database." (Doc. 61 at PAGEID # 803.) Apostelos' failure to cite any materials in the record to support his assertion violates the requirements of Fed. R. Civ. P. 56(c)(1). Furthermore, as referenced above, once the SEC establishes a *prima facie* violation of Section 5 (which it has), the defendant assumes the burden of proving that the security qualifies for a registration exemption, and scienter is not an element of a Section 5 violation. *Ralston-Purina Co.*, 346 U.S. at 126; *Calvo*, 378 F.3d at 1215. Yet Apostelos fails even to identify the allegedly applicable exemption and does not set forth facts that would establish an exemption.[5]

Accordingly, the SEC is entitled to summary judgment against Apostelos on Count VI.

### D. The SEC is Entitled to Summary Judgment on Count VII – Violation of Section 15(a)(1) of the Exchange Act.

Count VII alleges that Apostelos violated Section 15(a)(1) of the Exchange Act, which

---

[5] Furthermore, reliance on counsel is no defense to a Section 5 claim. *SEC v. Schooler*, 905 F.3d 1107, 1115 (9th Cir. 2018) ("Section 5 is a strict liability statute so good faith reliance on counsel cannot preclude liability under the statute") (internal quotation marks omitted).

makes it "unlawful for any broker or dealer … to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security … unless such broker or dealer is registered [with the SEC]." *George*, 426 F.3d at 792 (quoting 15 U.S.C. § 78o(a)(1)). A broker is defined as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). Several factors may qualify a defendant as a broker-dealer, including: (a) regular participation in securities transactions, (b) employment with the issuer of the securities, (c) payment by commission, (d) history of selling the securities of other issuers, (e) involvement in advice to investors, and (f) active recruitment of investors. *George*, 426 F.3d at 797 (finding Section 15(a) violation when the defendant "was regularly involved in communications with and recruitment of investors for the purchase of securities"); *see also Bravata*, 3 F. Supp. 3d at 660.

In his Plea Agreement, Apostelos admitted that he "convinced hundreds of individuals from around the country to place millions of dollars in assets under his control for the purpose of investment," including investments in the stock market. (*See* Criminal Action Doc. 58 at PAGEID # 281-82.) Also, the facts admitted in the Plea Agreement establish that Apostelos offered and sold securities of WMA and Midwest Green to hundreds of investors. (*Id.*) Apostelos also admitted that he used investors' money for personal expenses. (*Id.*; Aguilar Decl. (Doc. 52-2) at ¶7.) Further, Apostelos was not registered as a broker or dealer or associated with a broker-dealer registered with the SEC. (Aguilar Decl. at ¶ 24; Doc. 52-3 at PAGEID # 404-07.)

Apostelos makes no attempt to refute this claim beyond his unsupported assertion addressed above that an exemption to the registration requirements "was approved and sanctioned by The State of Ohio on the Edgar Database." (Doc. 61 at PAGEID # 803.) Given Apostelos' failure to otherwise refute the claim, there is no genuine issue of material fact that Apostelos

violated Section 15(a)(1) of the Exchange Act. *Bravata*, 3 F. Supp. 3d at 660 (granting summary judgment to SEC on claim for violation of Section 15(a)(1) of Exchange Act where defendant failed to attempt to refute claim and it was otherwise undisputed that defendants were not registered as a securities dealer).

Accordingly, the SEC is entitled to summary judgment against Apostelos on Count VII.

### E.  The SEC's Request for a Permanent Injunction, Disgorgement, and Prejudgment Interest.[6]

In its Motion, the SEC requests that this Court order various relief: (1) permanently enjoin Apostelos from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act, Sections 10(b) and 15(a)(1) of the Exchange Act (and Rule 10b-5 thereunder), and Sections 206(1), 206(2), and 206(4) of the Advisers Act (and Rule 206(4)-8 thereunder); (2) impose disgorgement of $11,194,472.99 against Apostelos, jointly and severally with the remaining Defendants and Relief Defendants[7]; (3) impose prejudgment interest of $587,371.04 against Apostelos, jointly and severally with the remaining Defendants and Relief Defendants; and (4) deem Apostelos' disgorgement and prejudgment interest obligations satisfied by the restitution and forfeiture ordered against him in the Criminal Action.  (Doc. 52 at PAGEID # 319.)

#### (1) Injunctive relief

The SEC can obtain permanent injunctive relief upon a proper showing that a person violated the federal securities laws and that there is a reasonable and substantial likelihood of future violations.  *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984); 15 U.S.C. § 77t(b), 78u(d), 80b-9(d).  Such injunctive relief is "primarily intended to protect the investing public from future

---

[6] In the Motion, the SEC states that "[i]n light of Apostelos's criminal conviction, the [SEC] requests the voluntary dismissal of its claim for civil penalties against Apostelos."  The Court grants this request.

[7] On October 1, 2018, after the SEC filed the Motion, this Court entered the "Final Judgment by Default Against Defendants WMA Enterprises, LLC; Midwest Green Resources, LLC; and OVO Wealth Management, LLC and Relief Defendants Connie Apostelos; Apostelos Enterprises, Inc.; Coleman Capital, Inc.; and Silver Bridle Racing, LLC."  (Doc. 56.)

misconduct." *Youmans*, 729 F.2d at 415. Where the SEC has established that past violations have occurred, a court may impose a permanent injunction against future violations. *Bravata*, 3 F. Supp. 3d at 662. The SEC need not show proof of irreparable harm nor inadequacy of legal remedies given that the basis of such an injunction is statutory rather than equitable. *Youmans*, 729 F.2d at 415; 15 U.S.C. § 77t(b), 78u(d), 80b-9(d). The test is "whether the SEC has shown a reasonable and substantial likelihood that [the defendant], if not enjoined, would violate the securities laws in the future." *Youmans*, 729 F.2d at 415. "The following factors are relevant in determining the likelihood of future violations: (1) the egregiousness of the violations, (2) the isolated or repeated nature of the violations, (3) the degree of scienter involved, (4) the sincerity of the defendant's assurances, if any, against future violations, (5) the defendant's recognition of the wrongful nature of his conduct, (6) the likelihood that the defendant's occupation will present opportunities (or lack thereof) for future violations, and (7) the defendant's age and health." *Id.* No one factor is determinative, and a change of occupation does not prevent the issuance of an injunction. *Id.*

Apostelos does not address the SEC's requested relief in his Opposition, apart from his arguments that the Motion be denied. (Doc. 61.) Based on the undisputed facts, test, and factors above, the Court finds that Apostelos should be permanently enjoined from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act, Sections 10(b) and 15(a)(1) of the Exchange Act (and Rule 10b-5 thereunder), and Sections 206(1), 206(2), and 206(4) of the Advisers Act (and Rule 206(4)-8 thereunder). Apostelos' violations from the fraudulent scheme that he orchestrated were egregious, far-reaching, repeated, and involved a high degree of scienter, and Apostelos is young and healthy enough (to the Court's knowledge) that he may be presented with opportunities for future violations. Weighing against imposing a permanent injunction is that Apostelos recognized the wrongful nature of his conduct through his guilty plea. However, even that is

tempered by some of his assertions in the Opposition. Regardless, the guilty plea is not enough to outweigh the other factors, and the SEC has shown a reasonable and substantial likelihood that Apostelos, if not enjoined, would violate the securities laws in the future. *See, e.g., Bravata*, 3 F. Supp. 3d at 662-63 (imposing permanent injunctions on defendants who were incarcerated after parallel criminal convictions involving a pyramid scheme); *Quinlan*, 2008 WL 4852904, at *9 (same).

### (2) Disgorgement and prejudgment interest

"The purpose of disgorgement is to force a defendant to give up the amount by which he was unjustly enriched." *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985) (internal quotation marks omitted). "Calculation of the defendant's economic gain need not be exact, and determination of the appropriate amount is left to the sound discretion of the trial court." *SEC v. Conaway*, 697 F. Supp. 2d 733, 747 (E.D. Mich. 2010); *see also SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996) ("The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged."). Once the SEC shows that its disgorgement figure is a "reasonable approximation of the defendant's ill-gotten gains," then the burden shifts to the defendant to show "that the SEC's estimate is unreasonable." *SEC v. Zada*, 787 F.3d 375, 382 (6th Cir. 2015) (internal quotation marks omitted); *see also First Jersey Sec.*, 101 F.3d at 1474-75 ("The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation"). Doubts concerning the amount of disgorgement are resolved against the violator. *Sierra Brokerage Servs.*, 608 F. Supp. 2d at 968.

"Court[s] may add prejudgment interest to the disgorgement amount to avoid a defendant benefitting from the use of his ill-gotten gains interest free." *Conaway*, 697 F. Supp 2d at 747, *citing SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978) (disgorgement is "the amount with interest

by which the defendant profited from his wrongdoing"). "The rate will be calculated based on [the] interest rate the [Internal Revenue Service] imposes for underpayment of taxes." *Bravata*, 3 F. Supp. 3d at 662 (internal citations omitted); *see also Conaway*, 697 F. Supp. 2d at 747; *Sierra Brokerage Servs.*, 608 F. Supp. 2d at 968, 974.

As set forth above, based on the calculations by and declaration of Mr. Aguilar, a Senior Accountant with the SEC, the SEC calculated the amount of disgorgement as $11,194,472.99, with prejudgment interest in the amount of $587,371.04. (Doc. 52-2 at PAGEID # 351-52; Doc. 52-3 at PAGEID # 357-75.) Apostelos makes no effort to challenge or counter the SEC's factual or legal support for imposing the relief, and he makes no effort to show that the SEC's calculations are unreasonable. (Doc. 61.)

The Court grants $11,194,472.99 of disgorgement and prejudgment interest in the amount of $587,371.04 against Apostelos. *See Bravata*, 3 F. Supp. 3d at 662 (ordering disgorgement of millions of dollars, plus prejudgment interest; neither defendant submitted any evidence to suggest that the SEC's figure was not a reasonable approximation of the proceeds they received). As the SEC notes in the Motion, Apostelos has been ordered to pay more than $32 million in restitution in connection with his criminal conviction and has forfeited assets traceable to the criminal offenses. (Doc. 52 at PAGEID # 345; Criminal Action Doc. 81.) The Court grants the SEC's "request[] that Apostelos be ordered to pay disgorgement and prejudgment interest in the amounts set forth above, but that his disgorgement and prejudgment interest obligations be deemed satisfied by the restitution and forfeiture ordered against him in the Criminal Action." (Doc. 52 at PAGEID # 345.) The Court also grants the SEC's request that, in light of Apostelos' criminal conviction, the SEC's claim for civil penalties against Apostelos be voluntarily dismissed. (*Id.*)

## IV.   CONCLUSION

For the reasons stated above, the Court **GRANTS** "Plaintiff United States Securities and Exchange Commission's Motion for Summary Judgment Against Defendant William M. Apostelos" (Doc. 52) and enters summary judgment in the Plaintiff's favor and against Apostelos on Counts I, II, V, VI, VII, VIII, and IX of the Complaint (Doc. 1).  Additionally, the Court **IMPOSES** the following relief: (a) Apostelos is permanently enjoined from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act, Section 10(b) and 15(a)(1) of the Exchange Act (and Rule 10b-5 thereunder), and Sections 206(1), 206(2), and 206(4) of the Advisers Act (and Rule 206(4)-8 thereunder) (i.e., 15 U.S.C. § 77e(a), 77e(c), and 77q(a); 15 U.S.C. § 78j(b) and 78o(a)(1); 17 C.F.R. § 240.10b-5; 15 U.S.C. § 80b-6(1), 80b-6(2), and 80b-6(4); and 17 C.F.R. § 275.206(4)-8); and (b) Apostelos is ordered to pay $11,194,472.99 of disgorgement and $587,371.04 in prejudgment interest, jointly and severally with Defendants and Relief Defendants in accordance with this Court's October 1, 2018 Final Judgment By Default (Doc. 56), although these obligations may be deemed satisfied by the restitution and forfeiture ordered against him in the Criminal Action (*United States v. Apostelos*, No. 3:15-cr-00148 (S.D. Ohio)).

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, August 21, 2019.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE